## ZOOK v. WOODS.
### No. 466.

United-States Emergency Court of Appeals.
Heard at St. Louis, June 7, 1948.
Decided Aug. 26, 1948.

Morton L. Schwartz and David K. Breed, both of St. Louis, Mo., for complainant.

Charles P. Liff, Chief, Appeals Section, of Washington, D. C. (Ed Dupree, General Counsel, Robert A. Sauer, Assistant General Counsel, and Lloyd Weisberger and Henry K. Osterman, Attorneys, all of the Office of the Housing Expediter, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and Mc-ALLISTER and LINDLEY, Judges.

McALLISTER, Judge.

Petitioner filed protests against orders of the Rent Director for the St. Louis Defense-Rental Area, which determined that certain premises were subject to the Housing Regulation, established maximum rents, and reduced retroactively the "first rents" that had been collected for the premises, pursuant to Section 5 of the Rent Regulation for Housing. The protests were referred by the Housing Expediter (herein also called the Administrator) for consid-

ation by a Board of Review which recommended that the protests, in so far as they claimed the premises were not subject to the Rent Regulation for Housing, be denied. It also recommended denial of the protest in so far as they contended that the first rents were improperly reduced by the Rent Director. The Board, however, recommended that the protest against the retroactive reduction be allowed. The Housing Expediter, nevertheless, denied the protests in their entirety; and the present complaint was filed in this court.

The premises in question were originally a school building containing eight large rooms, which complainant remodeled by making each room into an apartment by the use of partitions, and placing two extra apartments on the third floor, and two in the basement. The tenants on the first floor shared the bathroom in the rear of that floor, and the tenants on the second and third floors shared two bathrooms, one in the front part of the second floor, and one in the rear. Tenants of the basement apartments shared the first floor bathroom with the first floor tenants. All apartments had kitchens containing cooking stove, mechanical refrigerator, and water. Complainant first rented ten of the apartments on January 1, 1946, and two at a later date. All apartments were registered on the rooming house registration forms, within thirty days of first renting.

It is important to determine whether the units in question were rooms in a rooming house, or apartments, as apartments, and rooming houses must be registered in a different way on different forms. If they are not properly and adequately registered, any rents charged and collected are subject to retroactive reduction to the rents found to be those generally prevailing for comparable accommodations on the maximum rent date; and, in case of such a reduction, refund of the difference in the rent collected must be made by the landlord. If they are properly registered, the rents charged and collected may be later reduced, but only prospectively from the

entry of the order so reducing them. In cases of this kind, the line of distinction between rooms in a rooming house, and apartments in an apartment building is somtimes vague.

Both the Rent Regulation for Housing, Section 13(a) (12), and the Rent Regulation for Hotels and Rooming Houses, Section 13(a) (14), define a "rooming house" as follows:

" 'Rooming house' means, in addition to its customary usage, a building or portion of a building other than a hotel or motor court in which a furnished room or rooms not constituting an apartment are rented on a short term basis of daily, weekly or monthly occupancy to more than two paying tenants, not members of the landlord's immediate family * * *."

The Regulation for Hotels and Rooming Houses also defines a "room" to mean:

" 'Room' means a room or group of rooms, not constituting an apartment, rented or offered for rent as a unit in a transient hotel, residential hotel, rooming house or motor court * * *."

According to the Official Rent Interpretation,[1] it was stated:

"The Regulations do not provide a specific definition by which an 'apartment' can be distinguished from a furnished room or rooms. The distinguishing feature of an 'apartment' is taken to be that it is a room or suite of rooms containing all the facilities (including kitchen facilities) necessary for a complete and self-contained dwelling unit."

Complainant contends that the rooms in question do not partake of the character of a complete and self-contained dwelling unit; that the partitions between many of the rooms, not extending to the ceiling but only being six feet high, show that the rooms were not to be used as living apartments, because of the obvious lack of privacy, and could not be considered as complete and self-contained dwelling units; that the fact that twenty-four tenants from four floors share only four bath-

---

[1] Official Rent Interpretation 13(a) (14), Hotel—I, issued September 12, 1942, Pike and Fischer, OPA Service, P. 200:2937.

rooms—some from one floor sharing the bathroom on a different floor—clearly indicated the character of the premises as a rooming house, inasmuch as apartment dwellers do not share bathroom and toilet facilities in this wise; that rooms rented to different tenants, separated by such low partitions, and lighted by the same central electric light above the partition level, are obviously not apartments or complete and self-contained dwelling units, but merely rooms in a rooming house. In addition, complainant declared that he furnished shades, curtains, and laundry facilities, which, he asserts, are not commonly furnished in renting apartments. Moreover, complainant showed that the license under which he was permitted, by the City of St. Louis, to operate the building and rent the premises, was a Rooming House license. Complainant, therefore, asserts that he was engaged in renting "rooms" in a "rooming house," within the meaning of the regulation governing such units, as declared in the official interpretation with respect to such units

The government declares that the fact that the premises in question are classified by the City of St. Louis as a rooming house for purposes of licensing is not conclusive as to their character, if they are apartments within the contemplation of the Rent Regulation, and with the correctness of this contention, we agree. With respect to the sharing of baths and toilet facilities, there was proof of many instances where such facilities were shared among tenants of apartments. The record, furthermore, contains the expert opinions of two qualified witnesses, one of whom stated that the units in question were of a character customarily regarded in the St. Louis vicinity, as apartments; and the other expert gave it as his opinion that the units were of a character requiring registration as apartments. There were other items of evidence on this point introduced by both parties, which we do not here rehearse. While there might well be doubt in the mind of the citizen, unversed in law, and even on the part of his legal counsel, whether such units were "rooms" in a "rooming house," or "apartments,"

and they could, perhaps reasonably come to the conclusion that the units were properly subject to registration under the Rent Regulation for Hotels and Rooming Houses, rather than the Rent Regulation for Housing, we are limited in our jurisdiction, in this regard, to determining whether the order of the Rent Director, as affirmed by the Housing Expediter, was sustained by substantial evidence; and it must be clear, from the foregoing, that it was.

With respect to complainant's contention that the order reducing the "first rents" was unreasonable, we have examined the proofs as to the comparable accommodations upon which the order reducing rents was based. The affidavits supporting these proofs were not rebutted by the affidavit of complainant with respect to comparability, nor were any comparables submitted by complainant on his behalf. Affidavits, however, were introduced of two licensed and experienced real estate brokers who stated that they had examined the property in question, and that in their opinion, the facts stated in his affidavit by complainant were true, and that, in their opinion, the first rents which had been charged, were reasonable and fair "for the rooming house accommodations," in question. This proof was not substantiated by any comparables, and it is our conclusion that the order reducing the first rents was sustained by substantial evidence.

There remains the final point in the case—whether the order reducing the first rents should have been given retroactive effect, and complainant required to refund the difference between what was collected and the maximum rent as eventually established. Upon this issue, we must determine whether complainant filed proper registration statements, and, if not, whether he has shown that he was "not at fault" in failing to do so.

Section 4(e) of the Rent Regulation for Housing provides:

"If the Administrator finds that the landlord was not at fault in failing to file a proper registration statement within the time specified the order under section 5(c)

(1) may relieve the landlord of the duty to refund." [2]

From the regulations and their official interpretation, it certainly is not very clear what rooms in a rooming house are, as contrasted with apartments. The Regulation states that " 'Rooming house' means, in addition to its customary usage, * * *." What is its customary usage? In St. Louis, the premises in question were licensed as a rooming house. That is some evidence of how the building was considered locally, and that it corresponded to a rooming house—"in its customary usage." In addition to its customary usage, "rooming house" means, according to the Regulation, "a building or portion of a building, other than a hotel or motor court, in which a furnished room or rooms not constituting an apartment are rented on a short-term basis of daily, weekly, or monthly occupancy, to more than 2 paying tenants, not members of the landlord's immediate family." There were single furnished rooms, as well as groups of rooms in the subject building, rented on a basis of weekly and monthly rates. But they must be rooms, "not constituting an apartment." How, then, is an apartment defined? For nearly a year after the first renting of the units in this case, there was no definition in the Regulation of an "apartment," and the Official Rent Interpretation heretofore mentioned stated that the Regulations "do not provide a specific definition by which an 'apartment' can be distinguished from a furnished room or rooms." The Interpretation continued: "The distinguishing feature of an 'apartment' is taken to be that it is a room or suite of rooms containing all the facilities (including kitchen facilities) necessary for a complete and self-contained dwelling unit." But toilets and bathrooms are facilities necessary for a complete and self-contained dwelling unit, and in the subject building, the toilets and bathrooms were not contained within the dwelling unit. In some cases, it was necessary for tenants of one floor to use the toilet and bath facilities on a different floor; and complainant, in one of his affidavits in the protest proceedings, emphasized his claim that the units in the building were not self-contained, complete dwelling units because no unit had its own bathroom, and that the only way to get to the bathrooms in the building was to go out of the unit. We refer to these matters, not to weigh the evidence, as we have already decided that there was substantial evidence to sustain the order that the units were apartments. But we merely marshall these considerations, on the issue whether complainant was "at fault" in not registering the units as apartments rather than rooms in a rooming house. There can be no question that the premises were not properly registered. As stated, they must be considered apartments. They were registered on registration forms under a different Regulation as "rooms" in a "rooming house."

About sixty days after the registration of the units, on April 2, 1946, which was well within the time required by law for such registration, the Area Rent Director wrote complainant and stated that they had caused an investigation to be made of the units registered, and the result of the investigation indicated that the units were self-contained apartment units and were properly controlled under the Housing Regulation; the Director requested that the units be registered again as apartments. Complainant did not reply to this communication, but subsequently registered some additional units in the building as "rooms" rather than apartments. The Area Rent Director then, on April 26, 1946, served notice upon complainant of proceedings to determine the maximum rent, and set forth in the notice the following:

"In accordance with Section 5(d) of the Rent Regulation the Rent Director is attempting to secure information on the point(s) listed below about the accommodations described above. It is necessary to know the facts concerning these points in order to determine the Maximum Rent for the accommodations.

[2] Section 5(c) (1), above mentioned in the Regulation, refers to the provision under which the Administrator may reduce first rents to those generally prevailing for comparable accommodations during the base period.

"The rent for the accommodations on the Maximum Rent Date.

"1. Under which regulation the units at the above address are properly controlled?

"If such fact(s) cannot be obtained the Rent Director will fix as the Maximum Rent the rent generally prevailing in this Defense-Rental Area for comparable housing accommodations on the Maximum Rent Date.

"You may, within 7 days, file with the Rent Director any statement or written evidence with respect to this matter which you wish him to consider."

Complainant did not reply to the notice of proceedings to determine the maximum rent, and on May 9, 1946, an order was issued, holding that the units were "properly controlled under the housing regulation and should be so registered." On August 20, 1946, complainant filed an application for review of the Rent Director's order, by the Regional Administrator, on the ground that the units were not apartments but rooms in a rooming house; that they came within the regulations' definition of a rooming house, and that, inasmuch as none of them contained bath or toilet facilities, they could not be considered to be self-contained units. The relief which complainant requested, and which, in our opinion, is important, in the light of subsequent proceedings, was stated as follows: "we respectfully request that the rooming house registration be allowed to stand and that the landlord not be compelled to register this building under the Rent Regulations for Housing."

In accordance with official procedure, the Rent Director advised the complainant that he was reconsidering his order before forwarding the case for the review for which complainant had made application. In his letter to complainant, the Director stated that inspection had disclosed that the subject accommodations contained eight units "which are self-contained housekeeping accommodations *with the possible exception that the eight units share baths.*" This seemed to indicate either doubt or uncertainty, to some extent, in the mind of the Director as to the real character of the

units. But he further advised that he was recommending, on reconsideration, that the units were subject to registration as apartments.

On November 19, 1946, the Regional Administrator handed down his decision on the review of the Rent Director's order. After reciting that the Rent Director was of the opinion that the units were self-contained and should be registered under the Housing Regulation, and that the landlord refused so to register them, and "After a full review of the evidence and of the record pertaining to the * * * Application for Review, the Regional Administrator is of the opinion that, under the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 901 et seq., the Rent Regulation for Housing, the Rent Regulation for Hotels and Rooming Houses, the Revised Procedural Regulation No. 3, the above-mentioned order of the Area Rent Director issued on May 9, 1946, is not authorized and should be revoked in its entirety. It is, therefore, ordered that the above-described order issued by the Area Rent Director on May 9, 1946, be, and the same is hereby, revoked in its entirety."

This seemed to be a complete victory for complainant. He had asked in his application for review that his rooming house registration "be allowed to stand"; and the Regional Administrator had revoked, in its entirety, the decision of the Area Rent Director, ordering complainant to register his units as apartments.

Some time afterward, however, complaint's attorney happened to go to the St. Louis Rent Office to request a duplicate copy of his client's registration statement, and, while there, he was casually informed by the Associate Rent Examiner that the office had some "interpretations" from Washington, and that the decision of the Regional Administrator, holding the Rent Director's order with respect to complainant's premises, void in its entirety, was ill considered and erroneous. Complainant's attorney immediately asked if he would not have a chance to be heard before the order of the Regional Administrator was reversed, and was assured that he would

have such an opportunty. However, the order of the Regional Administrator was not reversed. Instead, complainant received on December 17, 1946, an unsolicited letter from the Regional Rent Attorney, stating that the Regional Administrator had revoked the Area Rent Director's previous order, but that should not be construed as meaning that the subject property should not be immediately registered under the Housing Regulation. The letter continued: "Our order merely meant that the Area Rent Director *did not have authority* to enter such an order under Section 5(d) of the Rent Regulation." (Emphasis supplied.)

On January 10, 1947, the Deputy Commissioner for Rent wrote complainant's attorney that the Regional Administrator was correct in revoking the Area Rent Director's previous order; that it was the opinion of the Regional Administrator, "in which opinion we concur, that the *method used by the area office for making the original determination was improper* and that a proper proceeding should be instituted by the area office for determining the status of your client's property." (Emphasis supplied.)

Thereafter, the Area Rent Director, on January 21, 1947, gave notice to complainant that he proposed, under Section 5(d), to determine certain facts which were in dispute or unknown and which were necessary to the establishment of the maximum rents for the subject units. After complainant had provided certain evidence with respect thereto, the Area Rent Director entered an order reducing the rents. In a letter explaining the order, the Rent Director stated that his previous order had been revoked "*because it failed to establish, in the determination, the specific rent for the units.*"

Here, then, were four different conflicting explanations given to complainant by the rent officials why the order of the Regional Administrator sustaining complainant's application for review was ineffective, and did not mean what it seemed to mean on its face, and informing complainant he would still be obliged to regis-

ter his units as apartments. He was told, on one occasion, that the Regional Administrator's decision, holding void in its entirety the previous order of the Rent Director, was ill considered and erroneous; on another occasion, that the Regional Administrator's decision merely meant that the Rent Director did not have authority to enter such an order; that the Rent Director's order has been revoked because it failed to establish, in the determination, the specific rent for the units; and, lastly, that the Regional Administrator's order only meant that the method used by the Area Office was improper. None of these reasons is worthy. When complainant filed an application for review on the ground that his units were "rooms" and not "apartments," as was held by the Rent Director, and asking that his registration of the units as "rooms" be allowed to stand, and the Rent Director's order that they be registered as apartments be reversed, he was entitled to some kind of decision with respect to what he was asking for. It is our conclusion that he received such a decision, and that it was intended by the order of the Regional Administrator to revoke the determination that the units were apartments, rather than rooms. That was the issue on review, and we hesitate to conclude that petitioner's proceedings for review were intended to be fobbed off by the Regional Administrator by an equivocal order, that did not mean what it appeared to mean, ignoring the merits of petitioner's claims, and only interpreting a tenuous technicality of regulatory procedure of concern only to the administrative officials.

The previous order of the Rent Director was, upon a full review of the evidence and the record, revoked in its entirety by the Regional Administrator; and, giving a fair reading to the order, we take it to mean that petitioner's contention, on the merits, was, at that time and by that order, upheld. If this were the case, and it seems the only plausible conclusion, then complainant, certainly, could not be said to be "at fault" in registering his premises as rooms rather than as apartments, and in continuing to insist that they were "rooms" in a "rooming house." It is of interest to

note that the official, constituting the Board of Review to which the protest was referred for consideration, Morris Lieberman, the Regional Rent Attorney of the Chicago Regional Office, was of the opinion that the complainant was without fault in not filing the correct forms, and that although they were incorrectly filed, they revealed the amount of rent charged and enough other information to enable the Rent Director to take action within the time required by law. The Board of Review also declared that the fact that the Rent Director actually did take action within that period, indicated that the registrations were sufficient to enable the Director to proceed, and that, accordingly, the protests should have been allowed insofar as they related to retroactivity. In this connection, it is to be observed that complainant showed that instructions to the rent officials provided:

"Where L, however, gave adequate information on the registration he filed to enable the Rent Director to determine that the rent for the housing accommodations is subject to reduction under Section 5(c) (1) the statement should be considered as meeting the requirements of the term 'proper registration statement.'"

The answer of the Expediter to this matter is that the instruction was a confidential office instruction, with the implication that complainant had no right to rely upon it. This, however, concerns the public, and if such consideration is given to one citizen in determining the correctness of the registration statements, every other citizen is entitled to the same treatment. Complainant's original registration statements were, under this "instruction," sufficiently adequate to warrant our conclusion that he was "not at fault" in the manner in which he registered and continued the registration of his premises.

"Therefore," as was said in a case involving somewhat different factors, "under the peculiar circumstances of the case, and giving weight to the saving provision of the second paragraph of § 4(e) covering the situation where the landlord was not at fault in failing to file a registration statement on time, we deem the challenged orders to be arbitrary and unwarranted in so far as they made the reduction of maximum rent retroactive." Peters v. Porter, Em.App.1946, 157 F.2d 186, 190. While in the instant case, the registration statements were timely filed, but were not technically "proper" statements, the same considerations apply as expressed in the Peters case.

From the foregoing, it is our conclusion that there was substantial evidence to sustain the determination of the Expediter that the units in question were apartments, and subject to registration under the Housing Regulation; that the first rents were properly reduced; and that the order reducing the rents charged for complainant's units should not be given retroactive, but only prospective effect, from the time of its entry.

A judgment will, accordingly, be entered setting aside the twelve orders of the Area Rent Director of the St. Louis Defense-Rental Area issued March 24, 1947, relating to the complainant's housing accommodations insofar as they decreased the maximum rents of such housing accommodations retroactively for any period of time prior to their date of issuance.